

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

BETTY WOODCOCK,

Plaintiff,

v.                                                          ACTION NO. 2:12cv474

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

Defendant.

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference, dated October 25, 2012. This Court RECOMMENDS that the decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL BACKGROUND

The plaintiff, Betty Woodcock ("Plaintiff" or "Woodcock"), filed an application for DIB

---

[1] The Commissioner of the Social Security Administration has changed from Michael Astrue to Carolyn Colvin. It is ORDERED that the style of the case shall be deemed amended to substitute as the sole respondent in this proceeding Carolyn W. Colvin, Acting Commissioner of Social Security.

on June 5, 2009, alleging she had been disabled since October 1, 2003. R. 132-38.[2] The application stemmed from bipolar disorder, depression, schizophrenia, a stroke, chronic obstructive pulmonary disease (COPD), high cholesterol, acid reflux, and insomnia. R. 151. The Commissioner denied Plaintiff's application, both initially on November 24, 2009, and upon reconsideration on May 25, 2010. R. 29.

At Plaintiff's request, a hearing before an Administrative Law Judge ("ALJ") took place on April 12, 2011, and an impartial vocational expert testified. R. 51-76.[3] On April 22, 2011, the ALJ issued a decision denying Plaintiff's claim. R. 29-37. On July 9, 2012, the Appeals Council denied Plaintiff's request to review the ALJ's decision, making the ALJ's decision the Commissioner's final decision. R. 1-5.

Having exhausted all administrative remedies, Plaintiff filed a complaint with this Court on August 22, 2012. ECF No. 1. Defendant filed an Answer to the Complaint on October 24, 2012. ECF No. 5. On October 25, 2012, an Order was entered directing the parties to file Motions for Summary Judgment. ECF No. 7. Plaintiff's Motion for Summary Judgment and Motion for Remand was submitted on November 19, 2012. ECF Nos. 8 & 9. Defendant Commissioner's Motion for Summary Judgment was filed on January 2, 2013. ECF No. 11. On January 7, 2013, Plaintiff filed her Reply to Defendant's Motion for Summary Judgment. ECF No. 13. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1953 and was fifty-three years old on her date last insured. R. 35. She was fifty years old when she alleges she was disabled. R. 35. Plaintiff attended school

---

[2] Page citations are to the administrative record previously filed by the Commissioner.
[3] The transcript incorrectly states the hearing occurred in 2012, when it in fact occurred in 2011.

through the seventh or eighth grade, (R. 58), and her past work included working as a certified nursing assistant at retirement and nursing homes from 1993 to 2003. R. 162, 169. Plaintiff filed her application for DIB on June 5, 2009, alleging disability as of October 1, 2003, based on bipolar disorder, depression, schizophrenia, a stroke, chronic obstructive pulmonary disease (COPD), high cholesterol, acid reflux, and insomnia. R. 132-138, 151. Plaintiff's last date insured was June 30, 2005. R. 31.

It is important to note that Ms. Woodcock previously had an adverse decision regarding disability. R. 34. That decision was rendered on June 3, 2004, and therefore, any claim of disability prior to that date is estopped by res judicata. R. 34. This means that the relevant period of review for this claim starts the day after the previous decision was rendered, June 4, 2004, and ends on Ms. Woodcock's date last insured, June 30, 2005.

### A. Medical Evidence Regarding Physical Impairments For Relevant Period From June 4, 2004, Through June 30, 2005

Plaintiff has a history of physical treatment with Nabil Tadros, M.D., from November 28, 2003, through January 23, 2009. R. 213-80. One month before the relevant time period for this appeal, in May 2004, Plaintiff went for a regular checkup and reported pain in her bones. R. 233. At that time, she complained of pain and arthralgias, especially in her knees. R. 233. She was assessed with COPD and edema. R. 233. She was continued on medication of Prevacid, Prozac, Xanax, Trazadone, Ditropan, Kenalog, Wellbutrin, Risperdal, a Combivent inhaler, and Plavix. R. 233.

In November 2004, Plaintiff contacted Dr. Tadros' office after she had missed a court appearance and requested a letter stating that she had memory loss due to a stroke. R. 231. She was referred to her psychiatrist for such a note. R. 231.

3

Plaintiff returned to Dr. Tadros in April 2005 for a checkup and to have her medication refilled. R. 230. At that time, she reported that she had stopped smoking and she had no headaches, dizziness, or shortness of breath. R. 230. Dr. Tadros assessed her with pharyngitis, gastroesophageal reflux disease, hyperlipidemia, chronic constipation, and a history of transient ischemic attack. R. 229.

In May 2005, Plaintiff returned to Dr. Tadros with swollen glands and face pain. R. 228.

### B. Medical Evidence Regarding Psychological Impairments For Relevant Period From June 4, 2004, Through June 30, 2005

Ms. Woodcock was treated for psychological impairments at Riverpoint Psychiatric Associates by Paul Mansheim, M.D. R. 397. On May 2, 2003, a year prior to the relevant time period, Ms. Woodcock reported increased problems with concentration and memory. R. 392. The doctor noted that Ms. Woodcock had exhibited memory problems, such as forgetting she had an appointment after speaking to office staff a half hour before her appointment. Dr. Mansheim prescribed Risperdal, Wellbutrin, Trazodone, Xanax, and Prozac. R. 392. On July 1, 2003, Dr. Mansheim noted that Plaintiff responded well to the medications and was helping her husband as he recovered from surgery. R. 391. However, at the same appointment, Ms. Woodcock reported trouble sleeping and her dose of Trazodone was increased. R. 391. At numerous appointments from July 2003 through January 2004, Dr. Mansheim reported Plaintiff was responding well to medication. R. 385-390.

On February 25, 2004, Ms. Woodcock stated that she was not doing well on Trazodone, and Dr. Mansheim substituted Chloral Hydrate. R. 384. On March 24, 2004, she again reported sleep issues and was switched from Chloral Hydrate to Remeron. R. 383.

One month before the relevant time period, on May 20, 2004, Dr. Manshiem noted that

Plaintiff "continues to respond fairly well to her present medications." R. 382. One month later, on June 21, 2004, Dr. Mansheim reported that Ms. Woodcock continued to respond fairly well, but Ms. Woodcock stated that Xanax was not controlling her anxiety. R. 381. Dr. Mansheim increased her dosage. At an appointment on August 19, 2004, Dr. Mansheim again reported that Ms. Woodcock was responding fairly well to medication. R. 380.

At a visit on September 20, 2004, Ms. Woodcock described changes in her condition. R. 379. She reported having hallucinations off and on, telling her to hurt other people, but she also knew that the voices were not real, and she denied wanting to act on these command hallucinations. R.379. She reported no issues with her medications and those were refilled. R. 379. In subsequent visits through June 30, 2005, Dr. Mansheim reported she responded well. R. 371-378.

On July 28, 2005, Ms. Woodcock informed the doctor that the "television is starting to talk to her" and she had started drooling, which she attributed to her Risperdal. R. 370. It was decided that she would start Abilify and taper off Risperdal. R. 370. A month after starting Abilify, she reported doing much better. R. 369. On November 18, 2005, Dr. Mansheim wrote that she was doing "fairly well," but that she complained of mood instability. R. 366. On January 13, 2006, Ms. Woodcock complained of increased depression, and her dose of Wellbutrin was increased. R. 365. On June 5, 2006, Ms. Woodcock reported difficulty sleeping and was started on Restoril. R. 361.

On April 16, 2007, Ms. Woodcock reported having involuntary movements on Abilify, and Dr. Mansheim decreased her dose of Abilify. R. 356. On January 10, 2008, Ms. Woodcock reported shaking in her legs and again her dose of Abilify was decreased. R. 351. However, on April 7, 2008, Ms. Woodcock reported having hallucinations and her use of Abilify was

discontinued entirely. R. 349. On May 6, 2008, Ms. Woodcock stated that she wished to get off Xanax because of the abuse potential. R. 348. Dr. Mansheim switched her to Klonopin. R. 348. No changes were made in Ms. Woodcock's medications at visits through January 7, 2009, and at most visits Dr. Mansheim reported she was doing well or doing better with her medications. R. 342-347. On February 11, 2009, Ms. Woodcock reported some "derealization" experiences, when she felt as if "someone else was looking through her eyes." R. 341. In response, Dr. Mansheim added Trilafon to her other medications. R. 341.

In a letter dated March 16, 2009, Dr. Mansheim stated that he began treating Ms. Woodcock in 1994, when she was working at a nursing home. R. 340. He wrote that Ms. Woodcock had become "increasingly impaired over time due to poor concentration, poor ability to manage her time, and a variety of medical problems, including muscle pain and other pain-causing situations." R. 340. Dr. Mansheim opined that Ms. Woodcock was continuously disabled as a result of her conditions since December 31, 1998. R. 340.

Dr. Mansheim completed a Psychiatric/Psychological Impairment Questionnaire. R. 281-288. He diagnosed major depressive disorder, recurrent with psychotic features. R. 281. Her GAF score was 50.[4] R. 281. He reported clinical findings including poor memory, mood disturbance, loss of intellectual ability of 15 points or more, delusions or hallucinations, difficulty thinking or concentrating, oddities of thought, perception, speech, or behavior, social withdrawal or isolation, and decreased energy. R. 282. Ms. Woodcock's primary symptoms were depression, cognitive dulling, and poor memory, each he considered severe. R. 283. Dr. Mansheim opined that the symptoms and limitations detailed in the questionnaire were present since October 1, 2003. R. 288.

---

[4] A GAF (Global Assessment of Functioning) of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders 32 (4th Ed. 1994).

In the questionnaire, Dr. Mansheim opined that Ms. Woodcock was markedly limited, which the questionnaire defined as effectively precluded, in her ability to remember locations and work-like procedures; her ability to understand and remember one or two step instructions; her ability to maintain attention and concentration for extended periods; her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; her ability to work in coordination with or proximity to others without being distracted by them; her ability to make simple work related decisions; her ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; her ability to interact appropriately with the public; and, her ability to respond appropriately to changes in the work setting. R. 284-285.

Dr. Mansheim checked a box that stated he believed that Ms. Woodcock "experienced episodes of deterioration or decompensation in work or work like settings that cause[d] []her to withdraw from that situation and/or experience an exacerbation of signs and symptoms." R. 286. He explained that he believed this was the case because she had "a tendency to regress under stress." R. 286. He noted that she is not a malingerer and was incapable of even "low stress" work. R. 287. Later, Dr. Mansheim completed a second Psychiatric/Psychological Impairment Questionnaire that found no changes in Ms. Woodcock's diagnoses, symptoms and limitations since August 24, 2009. R. 456-463.

**B. Plaintiff's Statement and Hearing Testimony**

At the ALJ hearing, Ms. Woodcock testified she lives with her husband and son. R. 56-57. She stated that her son takes her to the store to get groceries and helps around the house, including cutting the grass. R. 57. In discussing her daily life, Ms. Woodcock said she rarely

watches TV because she cannot follow what is happening and that she has difficulty reading. R. 64-65. Ms. Woodcock said she rarely cooks and that her son does most of the cooking, with her husband cooking occasionally. R.65. Further, she testified she drives no more than three blocks when she does drive. R. 57.

As far as her medical conditions, Ms. Woodcock testified that she cannot work due to her depression and medication side-effects of fatigue, tremors, pain in her legs, and two previous episodes of chest pain. R. 60. At times, she hears voices and feels like "someone is looking out of my eyes." R.60. She also testified that she has visual hallucinations of her adult children when they were children. R. 61. She described difficulty concentrating on household activities and remembering what words mean. R. 62. She also stated she has short-term and long-term memory loss. R. 62-63. Ms. Woodcock testified that being around people can be very difficult for her and often she just sits in her bedroom. R. 63-64.

A Vocational Expert ("VE") testified at the hearing. The VE testified that an individual of Ms. Woodcock's age, education, and work history, who was limited to simple, routine, one and two step work, in a low stress work environment, defined as occasional changes in the work setting and occasional decision making, occasional interaction with the public and co-workers, occasional supervision, and no production pace work, could work as a general laborer, an industrial cleaner, a kitchen helper, a janitor, a laundry worker, and a cleaner/housekeeper. R. 68-69. Based on these potential jobs, the VE testified that a number of jobs would be available locally. R. 68-69. The ALJ asked the VE what work would be available if this individual would also be off-task for twenty-five percent of the workday, and the VE testified that there would be no available work that this person could perform. R. 69.

## III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## IV. ANALYSIS

To qualify for a period of disability and DIB under section 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for DIB and a period of disability, and be under a "disability" as defined in the Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." *Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. *Hays*, 907 F.2d at 1456.

In reviewing the record, the Court RECOMMENDS that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED and DISMISSED.

### A. ALJ's Decision

In this case, the ALJ found the following regarding Plaintiff's condition. First, Plaintiff last met the insured status requirements of the Act on June 30, 2005. R. 31. Second, Plaintiff did not engage in substantial gainful activity during the period from her alleged onset of disability on October 1, 2003, through her date lasted insured on June 30, 2005. R. 31. Third, through her date last insured, Plaintiff's bipolar, depression and anxiety disorders constituted severe impairments. R. 31. The ALJ also found that Plaintiff's other physical ailments, like alleged back, knee and shoulder problems, stroke, COPD, and cholesterol problems were non-severe because those issues were not part of Plaintiff's treatment records during the period of evaluation in 2004-2005. R. 31. Fourth, through her date last insured, Plaintiff did not have an impairment or combination of impairments that meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 31. Fifth, through her date last insured, Plaintiff has the residual functional capacity (RFC) to perform work at all exertional levels but with some non-exertional limitations, including that Plaintiff can do "simple repetitive work in a low stress work environment without production or pace requirements, with occasional interaction with coworkers and the public, and

only occasional supervision, changes [in] the work setting, and work related decision making."
R. 33. Sixth, Plaintiff has no past relevant work, and therefore, transferability of job skills is not
an issue. R. 35. Seventh, through the date last insured, when considering Plaintiff's age,
education, work experience, and RFC, there were significant numbers of jobs in the national
economy that Plaintiff could have performed. R. 35. These findings led the ALJ to conclude
Plaintiff was not under a disability at any time between the alleged onset date of October 1,
2003, through the date last insured of June 30, 2005. R. 36.

### B. Plaintiff Assignments of Error

In her Memorandum in Support of her Motion for Summary Judgment, Plaintiff alleges
the ALJ made three errors in this case. ECF No. 10. First, Plaintiff argues that the ALJ erred by
failing to follow the treating physician rule. *Id.* at 7-11. Second, Plaintiff claims that the ALJ
failed to properly evaluate her credibility. *Id.* at 11. Third, Plaintiff contends that the ALJ relied
on flawed vocational expert testimony. *Id.* at 14. In reviewing the parties' briefs, the Court finds
that the ALJ's opinion is supported by substantial evidence and should be AFFIRMED.

### (i) Treating Physician Rule

Plaintiff objects to the ALJ's findings because the ALJ did not give Dr. Mansheim's
narrative opinions controlling weight, and alternatively, because the ALJ did not appear to weigh
and take into consideration the narrative opinions of Dr. Mansheim. *Id.* at 9. Defendant argues
that the ALJ took into consideration the applicable medical records from the relevant time period
and the opinions included. Def.'s Mem. in Support of Mot. for Summ. J. 10-11 (ECF No. 12).

Both parties agree that the ALJ focused on Dr. Mansheim's opinions within Ms.
Woodcock's records and gave those opinions "great weight" because "they contain treating
medical source opinions." R. 35. The parties diverge on what weight must be given to Dr.

Mansheim's opinions and what opinions are to be considered. Plaintiff focuses on the opinions included in questionnaires and letters written by Dr. Mansheim, Pl.'s Mem. in Support of Mot. for Summ. J. 9 (ECF No. 10), but Defendant focuses on the opinions contained within Ms. Woodcock's medical records. Def.'s Mem. in Support of Mot. for Summ. J. 10-11 (ECF No. 12).

Plaintiff is correct that the ALJ did not discuss or address Dr. Mansheim's opinions contained in the questionnaires he filled out on August 24, 2009 and on April 11, 2011. The ALJ only discussed Dr. Mansheim's opinions contained within Ms. Woodcock's medical records from 2004-2005. R. 34-35. However, the opinions contained in Dr. Mansheim's questionnaires are not supported by substantial evidence, and therefore, do not need to be given controlling weight.

In the questionnaires, Dr. Mansheim indicated that Ms. Woodcock had a number of mental limitations in areas of functions and was not capable of even "low stress work." R. 284-285, 287, 459-460, 462. He further stated that these limitations were present since October 2003 and were based on a number of issues including poor memory, loss of intellectual ability of 15 points or more, delusions or hallucinations, and difficultly concentrating. R. 282, 288, 457, 463.

Although the ALJ did not specifically discuss these opinions, these opinions are not entitled to controlling weight. A treating source's opinion on issues regarding the nature and severity of an impairment is to be given controlling weight if it is well supported by medically-accepted clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1526(b), 404.1527(d), 416.927(d)(2). However, it follows that "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In this case, the opinion that Plaintiff has a number of mental limitations is not supported by the clinical evidence. Although Plaintiff reported having hallucinations and the record included some evidence of psychological issues during the relevant time period, Dr. Mansheim's reports consistently include that Plaintiff was doing well or fairly well on her medications. *See e.g.*, R. 385-390, 379-382. Dr. Mansheim's contemporaneous reports indicate the Plaintiff was responding well to her treatment and that her condition was treatable. This does not support a conclusion that Plaintiff has the mental limitations that Dr. Mansheim's questionnaire indicated.

With this in mind, the ALJ's decision to not give this opinion controlling weight is supported by substantial evidence. The contemporaneous reports of Dr. Mansheim indicate that Ms. Woodcock reacted well to the treatment. Additionally, in reviewing the treatment by Dr. Mansheim, when Ms. Woodcock had difficulties or complications, those issues were generally remedied by a change in medication. *See supra* Part II.b.

Plaintiff also argues that the ALJ erred by not explaining the weight, if any, he gave to the questionnaires completed by Dr. Mansheim. Pl.'s Mem. in Support of Mot. for Summ. J. 9-10 (ECF No. 10). In this case, the ALJ did not ignore Dr. Mansheim's opinions, in fact he gave strong weight to the opinions provided within the relevant time period. The issue is whether he is required to explain the weight given to those opinions in the narrative questionnaires, and the Court FINDS that any failure to specifically address the opinions within the questionnaires is not reversible error.

Plaintiff cites a number of cases for the proposition that ALJ's must explain the weight given to opinions of a treating physician. Pl.'s Mem. in Support of Mot. for Summ. J. 9-10 (ECF No. 10). The cases cited by Plaintiff generally stand for the proposition that the ALJ must explain weights given to treating physicians' opinions, but these cases do not require that the

ALJ give reasons for the weight given to every particular opinion expressed by a treating physician. No doubt exists that in almost every case before an ALJ, a treating physician provides various opinions at different times during a patient's treatment, but this does not mean that the ALJ must discuss every specific opinion or instance.

Further, the opinions utilized by the ALJ, those contained within the treatment notes, are the applicable and relevant opinions to this claim. Those opinions are contemporaneous with treatment of Plaintiff during the relevant time period of 2004-2005. The questionnaires were filled out by Dr. Mansheim in 2009 and 2011, years after the relevant time period. Finally, as discussed before, the opinions contained in the questionnaires are not supported by the medicial evidence from the relevant time period.

The ALJ did what was required and specified the weight he gave and explained why that weight was given. Although he did not discuss every opinion provided by Dr. Mansheim, he did discuss the most applicable opinions because they were rendered during the applicable time period. The ALJ's failure to specifically discuss the opinions within Dr. Mansheim's questionnaires does not rise to the level of an error of law and is not reversible error.

### (ii) Credibility Assigned to Statements of Plaintiff

Plaintiff's second assignment of error is based on the ALJ's credibility determination of Plaintiff's subjective statements. The residual function capacity (RFC) determination must incorporate not only impairments supported by objective medical evidence, but also those impairments based on credible complaints made by the claimant. The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms. *Id.* If the underlying

impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individual's ability to work. *Id.* at 595.

The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Id.* at 595-96. Social Security Ruling 96-7p states that the evaluation of a plaintiff's subjective complaints must be based on the consideration of all the evidence in the record, including, but not limited to: (1) medical and laboratory findings, (2) diagnoses and medical opinions provided by treating or examining physicians and other medical sources; (3) statements from both the individual and treating or examining physicians about the claimant's medical history, treatment, response, prior work record, and the alleged symptoms' effect on the ability to work.

In this case, Plaintiff claims that the ALJ applied an incorrect standard in finding that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible. Pl.'s Mem. in Supp. of Mot. for Summ. J. 11-12. Plaintiff argues that the ALJ erred by evaluating Plaintiff's statements against the RFC determined by the ALJ, as opposed to the evidence of record. *Id.* The Commissioner defends the decision by asserting that a full review of the ALJ's decision shows that the ALJ considered the entire record. Def.'s Mem. in Supp. of Mot. for Summ. J. 15.

In making his credibility determination, the ALJ acknowledged that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms. R. 35. The ALJ then stated that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are *inconsistent with the above residual*

*functional capacity assessment.*" *Id.* (emphasis added).

This final statement of the ALJ appears as boilerplate language in any number of decisions by ALJs throughout the United States. *See e.g., Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004); *Racey v. Astrue*, 2013 WL 589223, at *6 (W.D. Va. Feb. 13, 2013). The Seventh Circuit in particular has been critical of the use of this verbiage, going so far as to call it "meaningless boilerplate [language]." *Parker*, 597 F. 3d at 922.

The use of this boilerplate language creates two problems. First, the Regulations instruct the ALJ to evaluate the consistency of a plaintiff's statements against all of the evidence of record, and not against just the ALJ's own RFC assessment. 20 C.F.R. § 404.1529(c)(4); *see also Maske v. Astrue*, 2012 WL 1988442, at *2-3, 14 (N.D. Ill. May 31, 2012) (finding remand to be appropriate where an ALJ discounted a plaintiff's credibility because her testimony did not mesh with the RFC determination, as the "ALJ's credibility analysis fail[ed] to build the required logical bridge between the evidence and the conclusion that her testimony was not credible"); *Spratt v. Astrue*, 2012 WL 1110018, at *23-24 (N.D. Iowa April 2, 2012) ( "[T]he 2010 decision [of the ALJ] is devoid of any reasons for his credibility determination. . . . The ALJ simply concluded that [Plaintiff's] testimony was 'inconsistent with the above residual functional capacity assessment. . . .' [T]he ALJ has failed in his duty to make an express credibility determination, detailing the reasons for discrediting the testimony, and setting forth inconsistencies in the record.").

The second problem, which is correlated to the first, is that the ALJ's conclusion regarding Plaintiff's credibility may indicate that the ALJ made his RFC determination before taking into account Plaintiff's credibility. Therefore, the ALJ could not have made his RFC

determination using all of the information on the record, because he had not yet made his credibility determination for Plaintiff's statements. *See Bjornson*, 671 F. 3d at 645 ("A deeper problem is that the assessment of a claimant's ability to work will often . . . depend[] heavily on the credibility of her statements."). The Court agrees with the Seventh Circuit that the ALJ stating that the he first made the RFC determination and then made a credibility determination "gets things backwards." *Id.*

In reviewing precedent within the Fourth Circuit, the Court found that both Judge B. Waugh Crigler and Judge James Welsh of the Western District of Virginia recently dealt with this issue. *See Racey*, 2013 WL 589223, at *6 (Judge Crigler); *Duff v. Astrue*, 5:11cv103, Dkt. No. 18, at *9 (W.D. Va. Nov. 30, 2012) (PACER) (Judge Welsh). Judge Welsh recommended, and his recommendation was adopted, that the case be remanded based on the ALJ's use of this boilerplate language because this language allows the ALJ to assume what he wishes to prove. *Duff*, 5:11cv103, ECF No. 18, at *9. Judge Crigler joined Judge Welsh and the Seventh Circuit in criticizing the use of this boilerplate language, but Judge Crigler found that "it [was] clear in the pages that follow the boilerplate language in this case, the [ALJ] considered the evidence of the record and provided sufficient support for both his RFC finding and his determination of plaintiff's credibility regarding the limiting effects of her condition." *Racey*, 2013 WL 589223, at *6.

In the present case, the Court, using a process similar to Judge Crigler's, FINDS that the ALJ did in fact consider all of the evidence on the record in making his determination. A "bare conclusion that [Plaintiff's] statements lack credibility because they are inconsistent with 'the above residual functional capacity assessment' does not discharge the duty to explain." *Kotofski v. Astrue*, 2010 WL 3655541, at *9 (D.Md. Sept. 14, 2010). However, in this case, the ALJ did

fulfill his duty to explain, and like in *Racey*, no reversible error occurred even though the ALJ used "meaningless" boilerplate language.

In the pages that precede the ALJ's use of the boilerplate language, particularly pages 33-35, the ALJ discussed in great detail issues of Plaintiff's credibility and what evidence casts doubt on Plaintiff's credibility. This included Plaintiff's treatment history and daily habits. R. 33-35. The ALJ found that there were inconsistencies in Plaintiff's testimony, that Plaintiff's testimony discussed her current situation and not her situation during 2004-2005, and found that Plaintiff's treatment history calls into doubt the credibility of Plaintiff's testimony. R. 33-35. This section of the opinion provided an in-depth discussion of Plaintiff's credibility and shows that the ALJ did not determine the RFC before determining Plaintiff's credibility. It is unfortunate that such boilerplate language was used, but the full view of the ALJ's opinion shows that he followed the steps required and examined all of the evidence in making his determination.

It should be noted that the ALJ did misstate the record slightly, as pointed out by Plaintiff. The ALJ's opinion states that Plaintiff "testified she was unable to drive a vehicle, [but] the claimant listed driving as an activity performed in her [Function] report." R. 33. Plaintiff testified "I got to where I could not drive at all, I could not get in a car to drive," and testified "now, I can drive a fourth mile, it's three blocks." R. 57. The Court agrees with Plaintiff that she did testify that she can now drive, however, this sliver of evidence does not rise to reversible error. The ALJ provided substantial evidence to support his RFC and his credibility determination, even without the testimony regarding driving.

### (iii) Vocational Expert Testimony

Plaintiff's final assignment of error is tangentially related to her first. Plaintiff alleges that

the ALJ erred by relying on the Vocational Expert's (VE) response to the ALJ's hypothetical that include the person working full-time, rather than relying on the hypothetical of a person who needed twenty-five percent of time off. *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. 14-16. Additionally, Plaintiff alleges that the ALJ erred because he "failed to present a hypothetical question to the Vocational Expert that adequately described even those mental limitations that [the ALJ] conceded were supported by the record." *Id.* at 15.

At step five of the ALJ's analysis, "the ALJ evaluates the claimant's RFC along with [her] age, education, and work experience, to determine whether the claimant can 'make an adjustment to other work.'" *Simila v. Astrue*, 573 F.3d 503 (7th Cir. 2009) (quoting 20 C.F.R. § 404.1520(a)(4)(v)). To do that the ALJ can use the testimony of a Vocational Expert by posing hypothetical situations for the VE's evaluation, as was done in this case. "In questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993) (internal citations omitted).

The first part of Plaintiff's argument is connected to Plaintiff's first argument regarding Dr. Mansheim's opinions. Plaintiff argues that the hypothetical presented, accounting for full-time work, is not supported by the medical evidence on the record. *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. 14-16. Instead, Plaintiff argues that the second hypothetical posed by the ALJ, one that allowed for the person to be absence from work twenty-five percent of the time, is supported by the evidence. Plaintiff's basis for that argument is Dr. Mansheim's opinion contained in the questionnaires he filled out.

Under Fourth Circuit precedent, the ALJ need only to include relevant limitations.

*English*, 10 F.3d at 1085. Dr. Mansheim's relevant opinions were those discussed in his treatment reports of Plaintiff during the relevant time period, rather than those included in the questionnaires completed in 2009 and 2011. Consequently, the ALJ was not require to include the limitations described in the questionnaires in the hypothetical for the VE.

In the second part of her argument, Plaintiff argues that the ALJ's opinion lacks substantial evidence at step five of the analysis because the hypothetical provided to the Vocational Expert did not includes mental limitations that the ALJ found to exist at step two of the analysis. *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. 15-16. Although the ALJ did not specifically include verbatim the limitations he found existed at step two of the process, the ALJ's hypothetical sufficiently accounted for those limitations.

The ALJ propounded the following hypothetical to the Vocational Expert:

Assum[e] a hypothetical individual with the same age, education, and work experience as the claimant with the following limitations: simple, routine, one-/two-step work; low stress, defined as occasional changes to the work setting and occasional work-related decision making; occasional interaction with the public and coworker; occasional supervision; and no production pace work. And there are no physical limitations.

R. 68. Plaintiff's objection to this hypothetical is that it did not incorporate the ALJ's finding at part two of the analysis that Plaintiff had "moderate difficulties" with social functioning and with "concentration, persistence, or pace." R. 32; *see also* Pl.'s Mem. in Supp. of Mot. for Summ. J. 15.

The Fourth Circuit's standard is that the ALJ's hypothetical must include all "relevant evidence." *English*, 10 F.3d at 1085. The mental limitations found by the ALJ at step two are relevant information, however, there is no requirement that those limitations be expressed exactly how they were expressed at step two of the analysis.

For example, the Seventh Circuit, in *Simila v. Astrue*, 573 F.3d 503 (7th Cir. 2009), held

that when an ALJ limited the hypothetical to "unskilled work," the limitation implicitly incorporated the mental limitations of a claimant with moderate difficulties with concentration, persistence, and pace." *Id.* at 521-522. In the present case, the ALJ also incorporated the limitations, but did so without explicitly using the same terms.

The ALJ found that Plaintiff had moderate difficulties with "concentration, persistence, [and] pace." R. 32. The ALJ's hypothetical included these limitations in two ways. He included in the hypothetical the limitation that the person's work was restricted to "simple, routine, one-/two-step work." R. 68. This accounts for the limitation on concentrating. However, as noted by the Third Circuit in *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004), that language does not address issues of pace or persistence. *Id.* at 554. The ALJ addressed those limitations by including in the hypothetical the restriction that the jobs have "no production pace work." R. 68.

Additionally, the ALJ incorporated limitations into the hypothetical that address Plaintiff's moderate limitation in social functioning. R. 32. To this end, the ALJ included the requirement that the work environment be "low stress, defined as occasional changes to the work setting and occasional work-related decision making; occasional interaction with the public and coworker; occasional supervision." R. 68. Further, in part two of the analysis, the ALJ noted that along with Plaintiff's moderate difficulties with social function, Plaintiff "reported spending no time with others, and lives with her son and husband." R. 32. This limitation of spending little time with others is addressed in the hypothetical by limiting the work environment to one that requires only "occasional interaction with the public and coworker[s]." R. 68.

In examining the hypothetical put to the VE, the ALJ did not use the exact words that he found in step two of the analysis, but he accounted for each of the moderate limitations. Therefore, the ALJ did not err and had substantial evidence at step five of the analysis in

considering the VE's opinion. Similarly, the ALJ did not err by utilizing the hypothetical that accounted for full-time work.

## V. **RECOMMENDATION**

Based on the foregoing analysis, it is the recommendation of this court that Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for Remand (ECF Nos. 8 and 9) be DENIED and DISMISSED and Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## VI. **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).

/s/
_____
Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June 18, 2013

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Joel C. Cunningham, Jr.
Joel C. Cunningham, Jr. PC
120 Edmunds Boulevard
P.O. Box 459
Halifax, VA 24558

Joel Eric Wilson
United States Attorney's Office
101 W. Main St., Suite 8000
Norfolk, VA 23510

By _____

Fernando Galindo, Clerk
Deputy Clerk

6-20 , 2013